1  Ronald D. Foreman, Esq. (SBN 61148)
   **FOREMAN & BRASSO**
2  930 Montgomery Street, Suite 600
   San Francisco, CA 94133
3  Telephone:  (415) 433-3475
   Facsimile:  (415) 781-8030
4  Email:  foremanandbrasso@foremanandbrasso.com

5  Attorneys for Qui Tam Relator-Plaintiff

6

7

8              **UNITED STATES DISTRICT COURT**

9             **NORTHERN DISTRICT OF CALIFORNIA**

10                **SAN FRANCISCO DIVISION**

11
   UNDER SEAL,                          CASE NO.  CV16 5881 LB
12
               Plaintiffs,              **SECOND AMENDED COMPLAINT FOR**
13                                      **VIOLATIONS OF FALSE CLAIMS ACT**
       v.                              31 U.S.C. §3730, et seq.
14

15
   UNDER SEAL,                          **JURY TRIAL DEMANDED**
16
               Defendants.             **LODGED UNDER SEAL PURSUANT TO**
17                                      31 U.S.C. § §3730(b)(2) and (3)

18

19

20

21

22

23

24

25

26

27

28

   **QUI TAM PLAINTIFF'S SECOND AMENDED COMPLAINT**         **CASE NO.  CV16 5881 LB**

Ronald D. Foreman, Esq. (SBN 61148)
**FOREMAN & BRASSO**
930 Montgomery Street, Suite 600
San Francisco, CA 94133
Tel: (415) 433-3475
Fax: (415) 781-8030
Email: foremanandbrasso@foremanandbrasso.com

Attorney for *Qui Tam* Relator-Plaintiff
FELIX LEVY

# UNITED STATED DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES, *ex rel*. FELIX LEVY,<br><br>Plaintiff,<br><br>vs.<br><br>SAN MATEO COUNTY and the SAN MATEO COUNTY MEDICAL CENTER, DOES 1 to 20, inclusive,<br><br>Defendants. | CASE NO.  CV165881 LB<br><br>SECOND AMENDED COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT 31 U.S.C. §3730, et seq.<br><br>**JURY TRIAL DEMANDED**<br><br>**LODGED UNDER SEAL PURSUANT TO 31 U.S.C. § §3730(b)(2) and (3)** |

COMES NOW QUI TAM RELATOR-PLAINTIFF Felix Levy, suing for himself and for the United States of America, pursuant to 31 U.S.C. §3730 et seq, and alleges as follows:

1.      This action alleges the defendants systematically defrauded Medicare and Medicaid (known as Medi-Cal in California) by making false claims and causing false claims to be made, for patients who did not qualify for Medicare and Medicaid acute level of care coverage and/or a 100-day Skilled Nursing Facility stay and/or for "observation" status and made false payments due to deliberate miscoding and misrepresenting facts associated with acute hospital stay instead of lower level of care (i.e. skilled nursing facility services or other services) provided that were non-acute. These billing practices and false claims have been submitted to Medicare and Medicaid for at least the past ten years.

**JURISDICTION**

2.     Jurisdiction over the federal claims asserted herein is based upon federal subject matter pursuant to 31 U.S.C. §3729, *et seq.*

3.     The Court may exercise personal jurisdiction over the defendants pursuant to 31 U.S.C. §3732(a).

**VENUE**

4.     Venue is proper in the Northern District of California, under 31 U.S.C. §3732 and 28 U.S.C. §§1391(b) and (c) because the defendants transact business in this District and because the defendants committed acts within this district that violated 31 U.S.C. §3729.

**PARTIES**

5.     *Qui tam* Relator-Plaintiff Felix Levy, is a resident and citizen of the United States. He currently resides in the State of California. Levy has been employed with Defendant San Mateo County and Defendant San Mateo Medical Center from December 2014 to the present as the Director of Resource Management, Manager II. Levy is a graduate of University of San Francisco in 1998 and has been employed as a Director of Nursing, Nursing Instructor, Utilization Review Nurse, Nurse Consultant, Case Manager and Director of Quality Improvement.

6.     The United States of America, through it agencies, including Centers for Medicare, has provided funds for the false claims alleged herein.

7.     Defendant San Mateo County is a local municipality headquartered in Redwood City, California, in the Northern District of California. San Mateo County owns and operates medical facilities and acute care hospitals, through which the defendants' violations of the False Claims Act were committed.

8.     Defendant San Mateo Medical Center ("SMMC") is a full service regional acute care medical center for San Mateo County, located in San Mateo, California, offering both inpatient and outpatient services. It is licensed as an acute care facility and also as a long-term care facility (a skilled nursing facility unit), and as an acute psychiatric facility. These claims relate to the practices of the acute care facility and SMMC's Skilled Nursing Facilities at 1A at

1  SMMC and Burlingame Long Term Care. SMMC is county-owned and controlled by and

2  through the San Mateo County Board of Supervisors. As a public hospital whose patient base

3  *also* includes economically indigent patients, SMMC acute care facility submits claims as a

4  Federally Qualified Health Center, which is a program that increases Medicare reimbursement to

5  the facility. SMMC also submits claims to Medicaid/Medi-Cal for reimbursement to its facility.

6  SMMC's acute care facility operates an 87-bed acute hospital. SMMC owns, holds the license

7  for, operates and oversees two Skilled Nursing Facilities (SNFs): Unit 1A of SMMC (30 beds)

8  known as "Long Term Care" and Burlingame Long Term Care SNF (281 beds).

## FACTUAL BACKGROUND

10  9.      The Medicare program is a federally funded healthcare program to provide

11  healthcare for the aged. Medicare providers have a legal duty to familiarize themselves with

12  Medicare's coverage and reimbursement rules, including those stated in the Medicare Manuals.

13  *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 64-65 (1984). A

14  provider's failure to inform itself of the legal requirements from participation in the program acts

15  in reckless disregard or deliberate ignorance of those requirements, either of which is sufficient

16  to charge it with knowledge of the falsity of the claims or certifications in question, under the

17  False Claims Act. *United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001).

18  10.      The Medicaid program is a joint Federal-State program, which provides, among

19  other things, long-term care for seniors. Medi-Cal is California's Medicaid program serving low-

20  income individuals with incomes below 138% of the federal poverty level. Medi-Cal health

21  benefits include ambulatory patient services, emergency services, hospitalization, maternity and

22  long term care, among other services.

23  11.      Defendants have engaged in a scheme to defraud the Medicare and Medical

24  programs. Defendants have systematically billed Medicare and Medi-Cal for noncovered

25  services and for duplicate services.

26  12.      In December 2014, Relator Felix Levy became the Manager of Resource

27  Management for SMMC. After several months in that position, he became aware that SMMC

28  was submitting claims to Medicare and Medi-Cal on behalf of non-qualifying patients.

1    13.    Regardless of expected length of stay, social admissions (i.e., when there is no

2  safe placement in the community available or that are for the convenience of the patient) are not

3  covered as inpatient Medicare Part A services. 78 Fed. Reg. 50947-48. The Centers for Medicare

4  & Medicaid Services ("CMS") promulgated the 2-midnight rule, which sets forth requirements

5  for admission at SMMC. See C.F.R. section 419.22(n). Despite these regulations, social

6  admission patients who did not qualify under Medicare and/or Medi-Cal guidelines for acute

7  care at SMMC, were nonetheless coded and billed to Medicare and/or Medi-Cal as qualifying

8  acute care patients by SMMC.

9    14.    In addition, SMMC permitted social admission outpatients to stay as inpatients or

10  in observation status in acute beds, which is not covered by Medicare or Medi-Cal. See Medicare

11  Benefit Policy Manual, Hospital Services Covered Under Part B. Whenever SMMC had no

12  venue to discharge patients post surgically due to a social reason, SMMC admitted those patients

13  on the acute floor and converted that patient into "inpatient" or "observation status." Because of

14  the improper coding, SMMC was paid a case rate for any given procedure and was subsequently

15  paid for observation services during the same time period; this resulted in double billing

16  Medicare. Medicare Benefit Policy Manual, Chapter 6, paragraph 20.6—[Observation services

17  are not covered if they are not reasonable and necessary for the diagnosis or treatment if the

18  patient]. Patients in "observation" status must pay out-of-pocket for their nursing care.

19    15.    SMMC knew that its social admission patients did not qualify for Medicare and/or

20  Medi-Cal reimbursements and payments. *In some instances,* SMMC issued Hospital-Issued

21  Notices of Noncoverage ("HINN") letters to social admission patients that stated that their

22  admissions did not meet the Medicare and/or Medi-Cal requirements:

23    Hospitals provide Hospital-Issued Notices of Noncoverage (HINNs) to beneficiaries prior

24  to admission, at admission, or at any point during an inpatient stay if the hospital determines that

25  the care the beneficiary is receiving, or is about to receive, is not covered because it is:

26    Not medically necessary;

27    Not delivered in the most appropriate setting; or

28    Is custodial in nature.

1    Despite issuing these HINN letters to the patients, SMMC turned around and submitted false

2    claims to Medicare and/or Medi-Cal for payment.

3       16.      Centers for Medicare & Medicaid Services ("CMS") pay acute-care hospitals,

4    such as SMMC, for inpatient stays under the Hospital Inpatient Prospective Payment System in

5    the Medicare Part A program and/or Medi-Cal. To provide greater clarity to hospitals and

6    physicians as to whether an inpatient admission is payable under Medicare Part A, CMS adopted

7    the Two-Midnight Rule for admissions beginning October 1, 2013. This rule established

8    Medicare and Medi-Cal payment policy regarding the benchmark criteria that should be used

9    when determining whether inpatient admission is reasonable and payable under Medicare Part A.

10    Under the Two-Midnight Rule, inpatient admissions will generally be payable under Part A if the

11    admitting practitioner expected the patient to require a hospital stay that crossed two midnights

12    and the medical record supports that reasonable expectation. Medicare Part A payment is

13    generally not appropriate for hospital stays not expected to span at least two midnights. On many

14    occasions, SMMC knowingly circumvented the Two-Midnight rule and submitted claims to

15    Medicare and/or Medi-Cal for a 1-day stay thereby fraudulently billing Medicare and/or

16    Medical. In August 2015, SMMC was audited by a CMS Quality Improvement Contractor,

17    Noridian, which sampled 10 cases. Noridian determined that 9 out of the 10 claims submitted did

18    not meet the Two-Midnight admission criteria. Despite Noridian's findings, SMMC continued its

19    1-day admissions practices and continued to submit fraudulent claims to Medicare and/or Medi-

20    Cal.

21       17.      Medicare and Medi-Cal, under its participation agreement, requires formal

22    utilization review of Medicare claims. Federal regulations require hospitals to have a utilization

23    review plan that provides for review of services that each hospital furnishes to Medicare and/or

24    Medi-Cal beneficiaries. 42 CFR §482.30. SMMC was required to have such a utilization review

25    plan, but does not.  For at least the past ten years, SMMC recklessly disregarded this requirement

26    and has allowed false claims to be made to Medicare.

27       18.      Recently, Relator Felix Levy took it upon himself to perform a Medicare

28    utilization review and audit for month of August 2016, wherein he found a 65% error rate in the

claims submitted to Medicare. That audit revealed that in August 2016, SMMC billed Medicare $484,000 for its patients but $365,000 of that amount was inappropriately billed as determined by a nurse utilization review. In addition, of the 114 days that were billed to Medicare, 67 of those days for non-acute services would have been improperly billed to Medicare had the audit not taken place. This one-month sample indicates that SMMC has wrongfully overbilled Medicare in this manner for at least the past ten years since there were no utilization reviews conducted and no mechanisms in place to prevent those bills from going out to Medicare.

In the course of Levy's utilization review and audit, Levy discovered that Medi-Cal was wrongfully overbilled. When SMMC's Interqual software used to determine a patient's length of hospital stay based upon the diagnoses and treatment involved in the patient's care stated "Criteria Not Met" the patient's stay was billed to Medi-Cal. Medi-Cal's requires that a physician advisor be assigned to review and approve the medical necessity of the patient's hospital stay, however no physician advisor was assigned by SMMC and the patient's hospital stay was billed to Medi-Cal without the requisite approval. Finally, the patient's charts were not documented consistent with the regulations that required daily progress notes to demonstrate acuity.

19.    SMMC has no written policy for billing Medicare and/or Medi-Cal as required by the Medicare Manuals.

20.    Relator Felix Levy brought these improper billing and coding practices as well as the lack of a Medicare and/or Medi-Cal Policy and utilization review policy to the attention of his supervisor Joan Spicer who told Levy to stay away from any further involvement with these issues and continue to submit bills regardless whether proper or improper. Levy subsequently notified billing department manager Portia Dixon who reviewed the claims and returned multiple pro fees to Medicare for the month of August 2016 only. Levy unilaterally insisted on instituting mandatory bill holds for all Medicare (and Medi-Cal) related claims as of September 2016 forward and requested that a medical director be assigned to the utilization review unit. These efforts by Levy were met with resistance by Chief Medical Officer Susan Fernyak and Joan Spicer. Levy also had a meeting with CEO Chester Kunnappilli, CFO David McGrew,

1   compliance officer Teasha Flaming and County Counsel Glen Levy to express his concerns

2   regarding SMMC's Medicare billing practices and requested that SMMC issue a formal policy

3   that was compliant with the law. Despite their statements that they were dealing with the

4   problems, nothing was done or changed with respect to billing Medicare and/or Medi-Cal for

5   non-qualifying patients at the acute facility.

6        21.     For the past 10 years SMMC has failed to institute Utilization Review process.

7   As a result, Medicare and Medi-Cal were excessively overbilled due to longer than necessary

8   length of stay.  This resulted in overinflated number of services provided to the patients.  Under

9   the CMS contract, SMMC had falsely reported larger number of acute hospital days and

10  continues to do so to seek higher CMS reimbursement from Medicare and Medi-Cal.

11       22.     **Observation Status.** In addition to the allegations above, SMMC has also

12  improperly billed Medicare Part B and Medi-Cal for alleged "observation" status of patients.

13  Observation status requires a medical necessity. Noridian requires documentation to support a

14  claim of medical necessity. Medicare Part B will cover and pay for patients in outpatient services

15  such as observation status. Knowing this, SMMC improperly places patients in "observation"

16  status and then improperly bills Medicare Part B and/or Medi-Cal for these services. This

17  practice occurs under a variety of circumstances, set forth below.

18       23.     First, a patient may have qualified for short-term outpatient post-surgical

19  management, such as a patient who undergoes a surgery. That patient would then be transferred

20  to the post-surgical recovery unit or post-anesthesia care unit (PACU), which closes at 4:30pm

21  each day. In these cases, Medicare or Medi-Cal would properly pay for surgical procedure plus

22  up to 23 hours of post-surgery observation time, which is called a "case rate." This means that

23  Medicare or Medi-Cal pays for the bundled service of the surgery plus 23 hours of post-surgery

24  observation. But instead of discharging the patient after the 23 hours of post-surgery observation,

25  SMMC improperly transfers the patient to the medical surgical care unit (2A or 2B) for

26  "observation" even if it is not medically necessary or re-registers the patient as under

27  "observation" status wholly unrelated to the surgery so SMMC can then bill Medicare Part B

28  and/or Medi-Cal for the "observation," even though Medicare or Medi-Cal has already paid for

1   23 hours of observation as part of the bundled case rate.

2       24.    Second, a patient may not have been qualified to be placed in observation status

3   post surgically beyond 23 hours at SMMC, but, nonetheless, that patient is transferred to

4   observation status as a "social admission" and may remain in "observation" for a period of time

5   for the convince of the patient or the hospital. In these cases, the patient should never have been

6   placed in observation status in the first instance, and the placement in observation status is a

7   sham so that defendants can bill Medicare Part B or Medi-Cal for attendant services for these

8   long "observation" stays when there is no medical necessity.

9       25.    Third, SMMC often admits people who have no medical necessity as "social

10   admissions" directly onto the medical surgical unit for "observation." Instead of referring these

11   people to a shelter, SMMC admits this population under "observation status," although

12   observation status requires a medical necessity. This population is held in "observation status" or

13   "Inpatient' status for long periods of time, beyond 72 hours, while SMMC improperly bills

14   Medicare Part B and/or Medi-Cal for their non-medical stay, in the event it decides not to bill for

15   inpatient services under Medicare Part A.

16       26.    With respect to the improper billing of Medi-Cal, defendant SMMC engaged in at

17   least two fraudulent practices: (1) improperly altering client files to pass a state audit and (2)

18   failing to obtain an independent physician review of the patient to determine the acuity and

19   obtain the proper medical necessity certification.

20       27.    Within first two month of his employment, plaintiff Felix Levy became aware of

21   the facts that files that were solicited for review and audit by the California Department of Health

22   Care Service ("DHCS") were improperly altered by SMMC staff under direct guidance from

23   Lorda Roumbau and Joan Spicer.  SMMC is part of what is called "TAR Free Project" which

24   allows SMMC to submit all Medi-Cal claims without a prior TAR (Treatment Authorization

25   Request).  In exchange for this streamlined process, defendant SMMC must submit patient files

26   identified by DHCS for periodic audits.  SMMC receives prior notice from DHCS of the files to

27   be audited.  Lorda Rumabau, under direct guidance from Joan Spicer, improperly altered

28   patient's medical records identified by DHCS for audit by adding additional documentation to

the files, such as Provider Daily Progress notes, that were specifically prepared for audit purposes by the providers, long after patients were discharged from the facility. The remainder of the unaltered Medi-Cal files not identified for audits by the DHCS are billed to Medi-Cal. Consequently, the determination of the SMMC variance rate was determined incorrectly by the DHCS audit team resulting in an improper recoupment process by DHCS for SMMC.

28. Further, whenever patient hospital stays cannot be justified through use of medical necessity screening tool (i.e. InterQual), it is a requirement to seek a medical necessity certification through utilization of Physician Advisor. The Physician Advisor is an independent practitioner, not directly involved in patient care, who can evaluate the patient's acuity level and then advise whether or not the patient's condition is still satisfactory for the acute level of billing for the medical condition and is not covered through the use of the medical necessity screening tool. Instead of engaging the required independent Physician Advisor, SMMC improperly utilizes the same physicians directly involved in providing the patient's medical care, in effect self-certifying their own patient's case.

29. **Skilled Nursing Facilities.** There are two Skilled Nursing Facilities (SNFs) that are owned and licensed by SMMC which oversees their operations: Skilled Nursing Facility 1A, known as "Long Term Care" (which is a unit within San Mateo Medical Center) with 30 beds and Burlingame Long Term Care Skilled Nursing Facility (SNF) with 281 beds. SMMC often improperly certifies patients for a 3-day inpatient stay, even though these patients had either no acuity at all or acuity for *less* than three days.

30. In order to qualify for a Medicare covered 100-day stay at a skilled nursing facility, a patient must have 3 consecutive days as an inpatient; days in observation do not count toward the 3 consecutive day inpatient requirement. This means a patient must have an actual and documented medical acuity for 3 consecutive days.

31. SMMC must certify that a patient has been an inpatient for 3 days as per CMS guidelines. SMMC has and continues to improperly certify patients that lack the medical necessity for a 3-day inpatient stay in order to transfer these patients to its SNFs (1A and Burlingame) so that can these SNFs can then bill Medicare Part A for a 100-day stay. SMMC

does this in order to transfer its patients to its SNFs (1A unit or to Burlingame Skilled Nursing Facilities) so that these skilled nursing facilities can then turn around and bill Medicare Part A for a 100-day stay at SMMC's skilled nursing facility, even though these patients did not have a legitimate 3-day inpatient stay at SMMC.

32. SMMC knowingly and fraudulently creates 3-day inpatient stays so that it can transfer these patients, who would not otherwise qualify for the 100-day coverage at a skilled nursing facility, to their 1A unit or Burlingame facility so that these skilled nursing facilities can then improperly bill Medicare Part A for a further 100-day stay at the skilled nursing facilities.

33. It is the policy and practice of Unit 1A and Burlingame to turn a blind eye as to whether or not the patient actually qualified for a 3-day in patient stay at SMMC so that these skilled nursing facilities can then improperly bill Medicare for a 100-day stay, when it is clear that there was no 3-day acuity. The SNFs' billing Medicare Part A for the 100-day stay is based on the initial, wrongful certification by SMMC of a 3-day acuity, a practice is known by all parties involved.

34. Likewise, SMMC improperly billed Medi-Cal for Skilled Nursing Facilities. DHCS would identify SMMC patient charts that DHCS was intending on auditing. SMMC employee Portia Dixon, in concert with her supervisor Joan Spicer, would insert phony SNF call logs for patient placement into the copied patient charts identified for audit to establish "reasonable efforts" for purposes of billing Medi-Cal for administrative days whether or not the patient met the SNF level of care. For example, SMMC billed Medi-Cal for administrative days for patients that did not have SNF skilled type needs such as frequent therapies, rehabilitation therapy/physical therapy and/or occupational therapy or any other need that requires ongoing assistance from a nurse or doctor and cannot be administered at home.

### I. COUNT ONE

### (For Violation of 31 U.S.C. §3730, et seq.)

35. Qui tam plaintiff hereby realleges and incorporates herein by this reference paragraphs 1 through 34, inclusive, as though fully set forth herein.

36. Defendants have knowingly caused to be submitted false claims for payment, as

set forth above, in violation of 31 U.S.C. §3729(a)(1). Additionally, defendants have knowingly caused to be used false records or statements to get false or fraudulent claims paid by the United States, in violation of 31 U.S.C. §3729(a)(2), and paid by Medi-Cal, a joint federal and state program. As a result of such knowing submission of false claims, defendants have wrongfully caused payments to be made from and has wrongfully received ones derived from, the United States Treasury in the millions of dollars.

## II. COUNT TWO

### (Retaliation in Violation of 31 U.S.C. §3730(h))

37.     The False Claims Act (FCA) prohibits individuals and companies from defrauding the federal government by making it illegal to submit claims for payment that involve certain kinds of deception or misrepresentation. Whistleblowers who work for government contractors or other entities that receive government funds through Medicare/Medicaid, defense contracts, or other programs, perform a crucial public service on behalf of all taxpayers when they oppose fraud. Many fraudulent schemes that violate the FCA involve a high volume of claims, sometimes amounting to millions of dollars of fraud against taxpayer funds. In addition to the financial incentives provided to whistleblowers under the FCA, the statute makes it illegal for employers to retaliate against employees who have opposed certain fraudulent activities. No employee, agent or contractor may be demoted, suspended, threatened, harassed or otherwise discriminated against for making a False Claims Act claim. 31 USC §3730(h).

38.     Plaintiff FELIX LEVY is, and at all times mentioned in this complaint was an employee of defendants SAN MATEO COUNTY and the SAN MATEO COUNTY MEDICAL CENTER, located in San Mateo County, California.

39.     Defendants SAN MATEO COUNTY and the SAN MATEO COUNTY MEDICAL CENTER are, and at all times mentioned in this complaint were plaintiff's employer and residents of San Mateo County, California. From plaintiff's date of hire on November 22, 2014 until November 22, 2017, plaintiff's immediate supervisor was Dr. Joan Spicer ("Spicer"). From November 22, 2017 to the present, plaintiff's immediate supervisor was and is Chief Financial Officer David McGrew ("McGrew"). At all times herein alleged, Spicer and McGrew

1 | were acting in the course and scope of their employment with defendants.

2 |     40.    Defendant Does 1 through 20, inclusive, are sued herein under fictitious names.

3 | Their true names and capacities are unknown to plaintiff. When their true names and capacities

4 | are ascertained, plaintiff will amend this complaint by inserting their true names and capacities

5 | herein. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named

6 | defendants are responsible in some manner for the occurrences herein alleged, and that plaintiff's

7 | damages as herein alleged were proximately caused by those defendants.

8 |     41.    On or about October 11, 2016, plaintiff filed this complaint for violations of the

9 | False Claims Act in this Court. The complaint alleges Medicare fraud, and now Medicaid fraud

10 | against defendants, as alleged more fully above.

11 |     42.    In or around early 2016 through August 2016, prior to filing this complaint,

12 | plaintiff raised his concerns about defendants' improper billing practices in staff meetings and to

13 | his supervisors. In an August 10, 2016 meeting, plaintiff "shared concerns regarding the practice

14 | of billing professional fee and ancillary services for Inpatient stays that do not meet medically

15 | [sic] necessary [sic] (medical necessity)." This was a recurring meeting wherein plaintiff

16 | discussed defendants' billing and Utilization Review management with the objective of

17 | compliant billing. Thus, as of August 2016, defendants knew plaintiff was flagging defendants'

18 | improper billing practices.

19 |     43.    In retaliation for plaintiff's pre-filing and post-filing disclosures of defendants'

20 | practice of improperly billing Medicare and Medicaid, defendants intentionally retaliated against,

21 | threatened, improperly disciplined and harassed plaintiff for making this False Claims Act

22 | Complaint:

23 |     a.    On or about September 8, 2016, Spicer issued a Performance

24 | Improvement Plan as a first step in setting into motion disciplinary action against plaintiff. The

25 | Performance Improvement plans was a direct result of Levy flagging defendants' improper

26 | billing and coding practices as well as the absence of a Medicare and/or Medi-Cal Policy and

27 | utilization review policy. Plaintiff brought these matters to Joan Spicer's attention in or around

28 | August 2016. Spicer told Levy to stay away from any further involvement with these issues and

1    to continue to submit bills regardless of whether the billing was proper or improper.

2           b.     In or around April/May 2017, plaintiff again brought defendants' improper

3    Medicare billing practices to the attention of his then-supervisor, Spicer. Plaintiff told Spicer and

4    McGrew what the billing team should and should not do with respect to Medicare billing. Instead

5    of correcting the wrong, Spicer instead issued a "Counseling Letter" to plaintiff on or about May

6    26, 2017. Spicer's letter confirms that plaintiff told defendants, through Spicer and McGrew, that

7    admitting a patient without medical necessity would be breaking the federal and state laws.

8    Defendants rejected plaintiff's analysis and continued improperly billing Medicare for patients

9    who did not qualify for admission to the hospital. As set forth in Spicer's May 26, 2017 letter,

10    "you [plaintiff] then stated that you were stopping the practice of false billing that I had been

11    doing for the past ten years for all of these patients admitted for no reason." Spicer ignored

12    plaintiff's requests to stop the improper billing of Medicare and initiated discipline against him

13    instead.

14           c.     On or about September 29, 2017, plaintiff met with Joan Spicer, then-his

15    supervisor, and David McGrew, defendants' Chief Financial Officer, where, according to Spicer,

16    plaintiff made "serious claims against the [defendant]." During that meeting, plaintiff expressed

17    his concerns over the improper billing of Medicare for admissions with no medical necessity, as

18    alleged in Count I. On or about November 22, 2017, Spicer wrote to David McGrew, "Felix's

19    habit of raising perceived concerns through anecdotal information has caused significant

20    disruption in the organization and significant work for me and others as we attempt to gather the

21    data to investigate the perceived concerns. My experience has been that Felix's representation

22    about the cause of his perceived concerns are often not supported by the data, once it has been

23    gathered and reviewed." Spicer also reported in that memo to McGrew: "Meanwhile, he has

24    accessed prior cases as far back as 2009, though his reason for doing so is unclear…"

25           d.     On or about October 11, 2016, plaintiff filed this case against defendants.

26           e.     On or about November 22, 2017, Spicer wrote McGrew a memo entitled

27    "Felix Levy Transition of Supervision Memo" wherein she raised baseless concerns over Levy's

28    work performance, another form of discipline and harassment.

1    f.    On or about early 2018, the name of the plaintiff/relator Felix Levy was
2  disclosed to defendants. Defendants indicated that it was no surprise and indicated that
3  defendants already knew the whistleblower was plaintiff Felix Levy. In retaliation, on or about
4  May 30, 2018, McGrew, in part relying on the memos and performance improvement plan
5  written by Spicer, issued a Letter of Reprimand to plaintiff Felix Levy to further defendants'
6  retaliatory campaign against him. In that letter, McGrew charged Levy with the failure to ensure
7  that a patient received timely and appropriate clinical care in February 2018, when the
8  contemporaneous medical records established that others, namely the attending nurse, had
9  cancelled the patient's surgery, not plaintiff. McGrew wrote in the Letter of Reprimand: "In
10  issuing this letter, I am aware and am familiar with a memo you received from your prior
11  supervisor, Chief Nursing Officer Dr. Joan Spicer, on February 19, 2016, regarding expectations
12  for your position, and a performance expectations memo you received on July 28, 2016. I am
13  also aware that you were placed on a Performance Improvement Plan (PIP) on September 8,
14  2018, which was updated on September 21, 2016, October 5, 2016, and finalized as of December
15  30, 2016, and that you received a counseling letter on May 26, 2017, related to your conduct and
16  performance. On November 22, 2017, during our meeting with SMMC CEO Dr. CJ Kunnappilly
17  and employee and Labor Relations Analyst Liz Caserza, you received a copy of the Transition
18  memo that Dr. Spicer provide to me in connection with transitioning your direct report
19  relationship to me, in which she detailed your incomplete work assignments related to you PIP. I
20  am issuing this Letter of Reprimand in an effort to communicate to you the seriousness of this
21  situation. Should there be similar incidents of this nature where your actions and lack of follow
22  through avoidable delays [sic] or jeopardizes a patient's care/safety placing both the San Mateo
23  Medical Center and the County at risk of liability, disciplinary action may be taken up to and
24  including dismissal from County employment." It is clear that from early 2016 to the present,
25  defendants have issued trumped up allegations of plaintiff's alleged poor performance to set the
26  stage for his termination due to his whistleblower actions pre-filing and after the filing of his
27  complaint.
28

g.      On or about February 26, 2018, someone employed by defendants informed the police that Levy was a danger to himself and others and may have a gun. As a result, on February 26, 2018, five police offers from the San Francisco police came to Levy's home to verify that plaintiff worked for defendants. Plaintiff's mother-in-law opened the door and told the officers that plaintiff was at work. Plaintiff was at work at the time the police went to his home. The police asked if plaintiff was "okay" and plaintiff's mother-in-law responded, "Yes, as far as I know." Plaintiff's mother-in-law later told plaintiff that the Redwood City Sheriff's department called the San Francisco Police and said the word "gun" was mentioned at plaintiff's place of work, so the matter was escalated to the San Francisco Police Department. Plaintiff then called the Redwood City Sheriff's Department, who told plaintiff that the word "gun" was mentioned at plaintiff's place of work and a distress call was placed from defendant San Mateo Medical Center stated that plaintiff "was acting odd" and that they "hoped he does not have a gun." That night, plaintiff personally visited the Richmond District Police Department who told plaintiff he was not in any trouble and stated "this was a very strange call from Redwood City and they were unsure as to what the Redwood City Police wanted them to do." Later, plaintiff received a call from DeAdnre James, defendant's Chief Operating Officer, who asked plaintiff is he was alright because he had received an email from someone working for defendant that plaintiff "was acting odd and looked like he [Levy] was under a lot of stress and hoped that he [Levy] did not have a gun." Plaintiff asked James why he did not call plaintiff directly and that it felt like intimidation and retaliation to plaintiff regarding the situation between plaintiff and defendants. As a result of this incident, plaintiff requested a formal HR investigation into these events, but has not been able to discover the name of the person who made the call.

h.      On or about May 11, 2018, plaintiff's wife, Maryam Dadashova, who also worked for defendants, was terminated effective June 1, 2018, without explanation.

i.      On or about May 30, 2018, plaintiff served McGrew with his Demand for an Immediate Retraction of the May 30, 2018 letter of reprimand, with supporting evidence that defendant's claim that plaintiff had endangered a patient was false. Despite this evidence,

McGrew refused to retract the May 30, 2018 letter of reprimand.

j.      After a meeting on June 4, 2018, McGrew emailed plaintiff the following: "The fact that you continue to promulgate the notion that Management is directing staff to do something inappropriate and you are not communicating & supporting the existing SMMC policy is deeply concerning and shows an unacceptable lack of judgment and leadership for a CSM-II. All of these actions taken by defendants against plaintiff constitute retaliation.

WHEREFORE, qui tam plaintiff prays for relief as follows:

1.      For full recitation to the United States of all money damages sustained;

2.      For three times the dollar amount proven to have been wrongfully sold to, paid by or withheld from the United States;

3.      For maximum civil penalties for all false records, statements, certifications and claims submitted to the United States;

4.      For damages due to defendant's retaliation of plaintiff;

5.      For costs of suit, reasonable attorney's fees and the maximum relator share; and

6.      For such other and further relief as the Court deems just and proper.

DATED: July 11, 2018                         FOREMAN & BRASSO

                                   By:    /s/ Ronald D. Foreman
                                          Ronald D. Foreman
                                          Attorney for *qui tam* plaintiff Felix Levy

# Exhibit 2

1  Ronald D. Foreman, Esq. (SBN 61148)
   **FOREMAN & BRASSO**
2  930 Montgomery Street, Suite 600
   San Francisco, CA 94133
3  Telephone:  (415) 433-3475
   Facsimile:  (415) 781-8030
4  Email:  foremanandbrasso@foremanandbrasso.com

5  Attorneys for Qui Tam Relator-Plaintiff

6

7

8                  **UNITED STATES DISTRICT COURT**

9                **NORTHERN DISTRICT OF CALIFORNIA**

10                   **SAN FRANCISCO DIVISION**

11
    UNDER SEAL,                          | CASE NO.  CV16 5881 LB
12
                      Plaintiffs,        | **SECOND AMENDED COMPLAINT FOR**
13                                        | **VIOLATIONS OF FALSE CLAIMS ACT**
              v.                          | **31 U.S.C. §3730, et seq.**
14

15
    UNDER SEAL,                          | **JURY TRIAL DEMANDED**
16
                      Defendants.        | **LODGED UNDER SEAL PURSUANT TO**
17                                        | **31 U.S.C. § §3730(b)(2) and (3)**

18

19

20

21

22

23

24

25

26

27

28

**QUI TAM PLAINTIFF'S SECOND AMENDED COMPLAINT**          **CASE NO.  CV16 5881 LB**

Ronald D. Foreman, Esq. (SBN 61148)
**FOREMAN & BRASSO**
930 Montgomery Street, Suite 600
San Francisco, CA 94133
Tel: (415) 433-3475
Fax:  (415) 781-8030
Email: foremanandbrasso@foremanandbrasso.com

Attorney for *Qui Tam* Relator-Plaintiff
FELIX LEVY

## UNITED STATED DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES, *ex rel.* FELIX LEVY,<br><br>Plaintiff,<br><br>vs.<br><br>SAN MATEO COUNTY and the SAN MATEO COUNTY MEDICAL CENTER, DOES 1 to 20, inclusive,<br><br>Defendants. | CASE NO.  CV165881 LB<br><br>SECOND AMENDED COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT 31 U.S.C. §3730, et seq.<br><br>**JURY TRIAL DEMANDED**<br><br>**LODGED UNDER SEAL PURSUANT TO 31 U.S.C. § §3730(b)(2) and (3)** |

COMES NOW QUI TAM RELATOR-PLAINTIFF Felix Levy, suing for himself and for the United States of America, pursuant to 31 U.S.C. §3730 et seq, and alleges as follows:

1.      This action alleges the defendants systematically defrauded Medicare and Medicaid (known as Medi-Cal in California) by making false claims and causing false claims to be made, for patients who did not qualify for Medicare and Medicaid acute level of care coverage and/or a 100-day Skilled Nursing Facility stay and/or for "observation" status and made false payments due to deliberate miscoding and misrepresenting facts associated with acute hospital stay instead of lower level of care (i.e. skilled nursing facility services or other services) provided that were non-acute. These billing practices and false claims have been submitted to Medicare and Medicaid for at least the past ten years.

**JURISDICTION**

2.     Jurisdiction over the federal claims asserted herein is based upon federal subject matter pursuant to 31 U.S.C. §3729, *et seq.*

3.     The Court may exercise personal jurisdiction over the defendants pursuant to 31 U.S.C. §3732(a).

**VENUE**

4.     Venue is proper in the Northern District of California, under 31 U.S.C. §3732 and 28 U.S.C. §§1391(b) and (c) because the defendants transact business in this District and because the defendants committed acts within this district that violated 31 U.S.C. §3729.

**PARTIES**

5.     *Qui tam* Relator-Plaintiff Felix Levy, is a resident and citizen of the United States. He currently resides in the State of California. Levy has been employed with Defendant San Mateo County and Defendant San Mateo Medical Center from December 2014 to the present as the Director of Resource Management, Manager II. Levy is a graduate of University of San Francisco in 1998 and has been employed as a Director of Nursing, Nursing Instructor, Utilization Review Nurse, Nurse Consultant, Case Manager and Director of Quality Improvement.

6.     The United States of America, through it agencies, including Centers for Medicare, has provided funds for the false claims alleged herein.

7.     Defendant San Mateo County is a local municipality headquartered in Redwood City, California, in the Northern District of California. San Mateo County owns and operates medical facilities and acute care hospitals, through which the defendants' violations of the False Claims Act were committed.

8.     Defendant San Mateo Medical Center ("SMMC") is a full service regional acute care medical center for San Mateo County, located in San Mateo, California, offering both inpatient and outpatient services. It is licensed as an acute care facility and also as a long-term care facility (a skilled nursing facility unit), and as an acute psychiatric facility. These claims relate to the practices of the acute care facility and SMMC's Skilled Nursing Facilities at 1A at

1   SMMC and Burlingame Long Term Care. SMMC is county-owned and controlled by and
2   through the San Mateo County Board of Supervisors. As a public hospital whose patient base
3   *also* includes economically indigent patients, SMMC acute care facility submits claims as a
4   Federally Qualified Health Center, which is a program that increases Medicare reimbursement to
5   the facility. SMMC also submits claims to Medicaid/Medi-Cal for reimbursement to its facility.
6   SMMC's acute care facility operates an 87-bed acute hospital. SMMC owns, holds the license
7   for, operates and oversees two Skilled Nursing Facilities (SNFs): Unit 1A of SMMC (30 beds)
8   known as "Long Term Care" and Burlingame Long Term Care SNF (281 beds).

9                                   **FACTUAL BACKGROUND**

10       9.      The Medicare program is a federally funded healthcare program to provide
11   healthcare for the aged. Medicare providers have a legal duty to familiarize themselves with
12   Medicare's coverage and reimbursement rules, including those stated in the Medicare Manuals.
13   *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 64-65 (1984). A
14   provider's failure to inform itself of the legal requirements from participation in the program acts
15   in reckless disregard or deliberate ignorance of those requirements, either of which is sufficient
16   to charge it with knowledge of the falsity of the claims or certifications in question, under the
17   False Claims Act. *United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001).

18       10.     The Medicaid program is a joint Federal-State program, which provides, among
19   other things, long-term care for seniors. Medi-Cal is California's Medicaid program serving low-
20   income individuals with incomes below 138% of the federal poverty level. Medi-Cal health
21   benefits include ambulatory patient services, emergency services, hospitalization, maternity and
22   long term care, among other services.

23       11.     Defendants have engaged in a scheme to defraud the Medicare and Medical
24   programs. Defendants have systematically billed Medicare and Medi-Cal for noncovered
25   services and for duplicate services.

26       12.     In December 2014, Relator Felix Levy became the Manager of Resource
27   Management for SMMC. After several months in that position, he became aware that SMMC
28   was submitting claims to Medicare and Medi-Cal on behalf of non-qualifying patients.

13.     Regardless of expected length of stay, social admissions (i.e., when there is no safe placement in the community available or that are for the convenience of the patient) are not covered as inpatient Medicare Part A services. 78 Fed. Reg. 50947-48. The Centers for Medicare & Medicaid Services ("CMS") promulgated the 2-midnight rule, which sets forth requirements for admission at SMMC. See C.F.R. section 419.22(n). Despite these regulations, social admission patients who did not qualify under Medicare and/or Medi-Cal guidelines for acute care at SMMC, were nonetheless coded and billed to Medicare and/or Medi-Cal as qualifying acute care patients by SMMC.

14.     In addition, SMMC permitted social admission outpatients to stay as inpatients or in observation status in acute beds, which is not covered by Medicare or Medi-Cal. See Medicare Benefit Policy Manual, Hospital Services Covered Under Part B. Whenever SMMC had no venue to discharge patients post surgically due to a social reason, SMMC admitted those patients on the acute floor and converted that patient into "inpatient" or "observation status." Because of the improper coding, SMMC was paid a case rate for any given procedure and was subsequently paid for observation services during the same time period; this resulted in double billing Medicare. Medicare Benefit Policy Manual, Chapter 6, paragraph 20.6—[Observation services are not covered if they are not reasonable and necessary for the diagnosis or treatment if the patient]. Patients in "observation" status must pay out-of-pocket for their nursing care.

15.     SMMC knew that its social admission patients did not qualify for Medicare and/or Medi-Cal reimbursements and payments. *In some instances,* SMMC issued Hospital-Issued Notices of Noncoverage ("HINN") letters to social admission patients that stated that their admissions did not meet the Medicare and/or Medi-Cal requirements:

Hospitals provide Hospital-Issued Notices of Noncoverage (HINNs) to beneficiaries prior to admission, at admission, or at any point during an inpatient stay if the hospital determines that the care the beneficiary is receiving, or is about to receive, is not covered because it is:

Not medically necessary;

Not delivered in the most appropriate setting; or

Is custodial in nature.

1  Despite issuing these HINN letters to the patients, SMMC turned around and submitted false
2  claims to Medicare and/or Medi-Cal for payment.

3      16.    Centers for Medicare & Medicaid Services ("CMS") pay acute-care hospitals,
4  such as SMMC, for inpatient stays under the Hospital Inpatient Prospective Payment System in
5  the Medicare Part A program and/or Medi-Cal. To provide greater clarity to hospitals and
6  physicians as to whether an inpatient admission is payable under Medicare Part A, CMS adopted
7  the Two-Midnight Rule for admissions beginning October 1, 2013. This rule established
8  Medicare and Medi-Cal payment policy regarding the benchmark criteria that should be used
9  when determining whether inpatient admission is reasonable and payable under Medicare Part A.
10  Under the Two-Midnight Rule, inpatient admissions will generally be payable under Part A if the
11  admitting practitioner expected the patient to require a hospital stay that crossed two midnights
12  and the medical record supports that reasonable expectation. Medicare Part A payment is
13  generally not appropriate for hospital stays not expected to span at least two midnights. On many
14  occasions, SMMC knowingly circumvented the Two-Midnight rule and submitted claims to
15  Medicare and/or Medi-Cal for a 1-day stay thereby fraudulently billing Medicare and/or
16  Medical. In August 2015, SMMC was audited by a CMS Quality Improvement Contractor,
17  Noridian, which sampled 10 cases. Noridian determined that 9 out of the 10 claims submitted did
18  not meet the Two-Midnight admission criteria. Despite Noridian's findings, SMMC continued its
19  1-day admissions practices and continued to submit fraudulent claims to Medicare and/or Medi-
20  Cal.

21      17.    Medicare and Medi-Cal, under its participation agreement, requires formal
22  utilization review of Medicare claims. Federal regulations require hospitals to have a utilization
23  review plan that provides for review of services that each hospital furnishes to Medicare and/or
24  Medi-Cal beneficiaries. 42 CFR §482.30. SMMC was required to have such a utilization review
25  plan, but does not.  For at least the past ten years, SMMC recklessly disregarded this requirement
26  and has allowed false claims to be made to Medicare.

27      18.    Recently, Relator Felix Levy took it upon himself to perform a Medicare
28  utilization review and audit for month of August 2016, wherein he found a 65% error rate in the

1  claims submitted to Medicare. That audit revealed that in August 2016, SMMC billed Medicare
2  $484,000 for its patients but $365,000 of that amount was inappropriately billed as determined
3  by a nurse utilization review. In addition, of the 114 days that were billed to Medicare, 67 of
4  those days for non-acute services would have been improperly billed to Medicare had the audit
5  not taken place. This one-month sample indicates that SMMC has wrongfully overbilled
6  Medicare in this manner for at least the past ten years since there were no utilization reviews
7  conducted and no mechanisms in place to prevent those bills from going out to Medicare.

8       In the course of Levy's utilization review and audit, Levy discovered that Medi-Cal was
9  wrongfully overbilled.  When SMMC's Interqual software used to determine a patient's length of
10 hospital stay based upon the diagnoses and treatment involved in the patient's care stated
11 "Criteria Not Met" the patient's stay was billed to Medi-Cal. Medi-Cal's requires that a
12 physician advisor be assigned to review and approve the medical necessity of the patient's
13 hospital stay, however no physician advisor was assigned by SMMC and the patient's hospital
14 stay was billed to Medi-Cal without the requisite approval. Finally, the patient's charts were not
15 documented consistent with the regulations that required daily progress notes to demonstrate
16 acuity.

17      19.    SMMC has no written policy for billing Medicare and/or Medi-Cal as required by
18 the Medicare Manuals.

19      20.    Relator Felix Levy brought these improper billing and coding practices as well as
20 the lack of a Medicare and/or Medi-Cal Policy and utilization review policy to the attention of
21 his supervisor Joan Spicer who told Levy to stay away from any further involvement with these
22 issues and continue to submit bills regardless whether proper or improper.  Levy subsequently
23 notified billing department manager Portia Dixon who reviewed the claims and returned multiple
24 pro fees to Medicare for the month of August 2016 only. Levy unilaterally insisted on instituting
25 mandatory bill holds for all Medicare (and Medi-Cal) related claims as of September 2016
26 forward and requested that a medical director be assigned to the utilization review unit. These
27 efforts by Levy were met with resistance by Chief Medical Officer Susan Fernyak and Joan
28 Spicer. Levy also had a meeting with CEO Chester Kunnappilli, CFO David McGrew,

1   compliance officer Teasha Flaming and County Counsel Glen Levy to express his concerns

2   regarding SMMC's Medicare billing practices and requested that SMMC issue a formal policy

3   that was compliant with the law. Despite their statements that they were dealing with the

4   problems, nothing was done or changed with respect to billing Medicare and/or Medi-Cal for

5   non-qualifying patients at the acute facility.

6         21.     For the past 10 years SMMC has failed to institute Utilization Review process.

7   As a result, Medicare and Medi-Cal were excessively overbilled due to longer than necessary

8   length of stay.  This resulted in overinflated number of services provided to the patients.  Under

9   the CMS contract, SMMC had falsely reported larger number of acute hospital days and

10   continues to do so to seek higher CMS reimbursement from Medicare and Medi-Cal.

11         22.     **Observation Status.** In addition to the allegations above, SMMC has also

12   improperly billed Medicare Part B and Medi-Cal for alleged "observation" status of patients.

13   Observation status requires a medical necessity. Noridian requires documentation to support a

14   claim of medical necessity. Medicare Part B will cover and pay for patients in outpatient services

15   such as observation status. Knowing this, SMMC improperly places patients in "observation"

16   status and then improperly bills Medicare Part B and/or Medi-Cal for these services. This

17   practice occurs under a variety of circumstances, set forth below.

18         23.     First, a patient may have qualified for short-term outpatient post-surgical

19   management, such as a patient who undergoes a surgery. That patient would then be transferred

20   to the post-surgical recovery unit or post-anesthesia care unit (PACU), which closes at 4:30pm

21   each day. In these cases, Medicare or Medi-Cal would properly pay for surgical procedure plus

22   up to 23 hours of post-surgery observation time, which is called a "case rate." This means that

23   Medicare or Medi-Cal pays for the bundled service of the surgery plus 23 hours of post-surgery

24   observation. But instead of discharging the patient after the 23 hours of post-surgery observation,

25   SMMC improperly transfers the patient to the medical surgical care unit (2A or 2B) for

26   "observation" even if it is not medically necessary or re-registers the patient as under

27   "observation" status wholly unrelated to the surgery so SMMC can then bill Medicare Part B

28   and/or Medi-Cal for the "observation," even though Medicare or Medi-Cal has already paid for

1   23 hours of observation as part of the bundled case rate.

2       24.     Second, a patient may not have been qualified to be placed in observation status

3   post surgically beyond 23 hours at SMMC, but, nonetheless, that patient is transferred to

4   observation status as a "social admission" and may remain in "observation" for a period of time

5   for the convince of the patient or the hospital. In these cases, the patient should never have been

6   placed in observation status in the first instance, and the placement in observation status is a

7   sham so that defendants can bill Medicare Part B or Medi-Cal for attendant services for these

8   long "observation" stays when there is no medical necessity.

9       25.     Third, SMMC often admits people who have no medical necessity as "social

10  admissions" directly onto the medical surgical unit for "observation." Instead of referring these

11  people to a shelter, SMMC admits this population under "observation status," although

12  observation status requires a medical necessity. This population is held in "observation status" or

13  "Inpatient' status for long periods of time, beyond 72 hours, while SMMC improperly bills

14  Medicare Part B and/or Medi-Cal for their non-medical stay, in the event it decides not to bill for

15  inpatient services under Medicare Part A.

16      26.     With respect to the improper billing of Medi-Cal, defendant SMMC engaged in at

17  least two fraudulent practices: (1) improperly altering client files to pass a state audit and (2)

18  failing to obtain an independent physician review of the patient to determine the acuity and

19  obtain the proper medical necessity certification.

20      27.     Within first two month of his employment, plaintiff Felix Levy became aware of

21  the facts that files that were solicited for review and audit by the California Department of Health

22  Care Service ("DHCS") were improperly altered by SMMC staff under direct guidance from

23  Lorda Roumbau and Joan Spicer.  SMMC is part of what is called "TAR Free Project" which

24  allows SMMC to submit all Medi-Cal claims without a prior TAR (Treatment Authorization

25  Request).  In exchange for this streamlined process, defendant SMMC must submit patient files

26  identified by DHCS for periodic audits.  SMMC receives prior notice from DHCS of the files to

27  be audited.  Lorda Rumabau, under direct guidance from Joan Spicer, improperly altered

28  patient's medical records identified by DHCS for audit by adding additional documentation to

1   the files, such as Provider Daily Progress notes, that were specifically prepared for audit

2   purposes by the providers, long after patients were discharged from the facility. The remainder of

3   the unaltered Medi-Cal files not identified for audits by the DHCS are billed to Medi-Cal.

4   Consequently, the determination of the SMMC variance rate was determined incorrectly by the

5   DHCS audit team resulting in an improper recoupment process by DHCS for SMMC.

6          28.      Further, whenever patient hospital stays cannot be justified through use of

7   medical necessity screening tool (i.e. InterQual), it is a requirement to seek a medical necessity

8   certification through utilization of Physician Advisor.  The Physician Advisor is an independent

9   practitioner, not directly involved in patient care, who can evaluate the patient's acuity level and

10  then advise whether or not the patient's condition is still satisfactory for the acute level of billing

11  for the medical condition and is not covered through the use of the medical necessity screening

12  tool.  Instead of engaging the required independent Physician Advisor, SMMC improperly

13  utilizes the same physicians directly involved in providing the patient's medical care, in effect

14  self-certifying their own patient's case.

15         29.      **Skilled Nursing Facilities**. There are two Skilled Nursing Facilities (SNFs) that

16  are owned and licensed by SMMC which oversees their operations: Skilled Nursing Facility 1A,

17  known as "Long Term Care" (which is a unit within San Mateo Medical Center) with 30 beds

18  and Burlingame Long Term Care Skilled Nursing Facility (SNF) with 281 beds. SMMC often

19  improperly certifies patients for a 3-day inpatient stay, even though these patients had either no

20  acuity at all or acuity for *less* than three days.

21         30.      In order to qualify for a Medicare covered 100-day stay at a skilled nursing

22  facility, a patient must have 3 consecutive days as an inpatient; days in observation do not count

23  toward the 3 consecutive day inpatient requirement. This means a patient must have an actual

24  and documented medical acuity for 3 consecutive days.

25         31.      SMMC must certify that a patient has been an inpatient for 3 days as per CMS

26  guidelines. SMMC has and continues to improperly certify patients that lack the medical

27  necessity for a 3-day inpatient stay in order to transfer these patients to its SNFs (1A and

28  Burlingame) so that can these SNFs can then bill Medicare Part A for a 100-day stay. SMMC

1   does this in order to transfer its patients to its SNFs (1A unit or to Burlingame Skilled Nursing

2   Facilities) so that these skilled nursing facilities can then turn around and bill Medicare Part A

3   for a 100-day stay at SMMC's skilled nursing facility, even though these patients did not have a

4   legitimate 3-day inpatient stay at SMMC.

5       32.    SMMC knowingly and fraudulently creates 3-day inpatient stays so that it can

6   transfer these patients, who would not otherwise qualify for the 100-day coverage at a skilled

7   nursing facility, to their 1A unit or Burlingame facility so that these skilled nursing facilities can

8   then improperly bill Medicare Part A for a further 100-day stay at the skilled nursing facilities.

9       33.    It is the policy and practice of Unit 1A and Burlingame to turn a blind eye as to

10   whether or not the patient actually qualified for a 3-day in patient stay at SMMC so that these

11   skilled nursing facilities can then improperly bill Medicare for a 100-day stay, when it is clear

12   that there was no 3-day acuity. The SNFs' billing Medicare Part A for the 100-day stay is based

13   on the initial, wrongful certification by SMMC of a 3-day acuity, a practice is known by all

14   parties involved.

15       34.    Likewise, SMMC improperly billed Medi-Cal for Skilled Nursing Facilities.

16   DHCS would identify SMMC patient charts that DHCS was intending on auditing.  SMMC

17   employee Portia Dixon, in concert with her supervisor Joan Spicer, would insert phony SNF call

18   logs for patient placement into the copied patient charts identified for audit to establish

19   "reasonable efforts" for purposes of billing Medi-Cal for administrative days whether or not the

20   patient met the SNF level of care.  For example, SMMC billed Medi-Cal for administrative days

21   for patients that did not have SNF skilled type needs such as frequent therapies, rehabilitation

22   therapy/physical therapy and/or occupational therapy or any other need that requires ongoing

23   assistance from a nurse or doctor and cannot be administered at home.

## I. COUNT ONE

### (For Violation of 31 U.S.C. §3730, et seq.)

26       35.    Qui tam plaintiff hereby realleges and incorporates herein by this reference

27   paragraphs 1 through 34, inclusive, as though fully set forth herein.

28       36.    Defendants have knowingly caused to be submitted false claims for payment, as

set forth above, in violation of 31 U.S.C. §3729(a)(1). Additionally, defendants have knowingly caused to be used false records or statements to get false or fraudulent claims paid by the United States, in violation of 31 U.S.C. §3729(a)(2), and paid by Medi-Cal, a joint federal and state program. As a result of such knowing submission of false claims, defendants have wrongfully caused payments to be made from and has wrongfully received ones derived from, the United States Treasury in the millions of dollars.

## II. COUNT TWO

### (Retaliation in Violation of 31 U.S.C. §3730(h))

37.     The False Claims Act (FCA) prohibits individuals and companies from defrauding the federal government by making it illegal to submit claims for payment that involve certain kinds of deception or misrepresentation. Whistleblowers who work for government contractors or other entities that receive government funds through Medicare/Medicaid, defense contracts, or other programs, perform a crucial public service on behalf of all taxpayers when they oppose fraud. Many fraudulent schemes that violate the FCA involve a high volume of claims, sometimes amounting to millions of dollars of fraud against taxpayer funds. In addition to the financial incentives provided to whistleblowers under the FCA, the statute makes it illegal for employers to retaliate against employees who have opposed certain fraudulent activities. No employee, agent or contractor may be demoted, suspended, threatened, harassed or otherwise discriminated against for making a False Claims Act claim. 31 USC §3730(h).

38.     Plaintiff FELIX LEVY is, and at all times mentioned in this complaint was an employee of defendants SAN MATEO COUNTY and the SAN MATEO COUNTY MEDICAL CENTER, located in San Mateo County, California.

39.     Defendants SAN MATEO COUNTY and the SAN MATEO COUNTY MEDICAL CENTER are, and at all times mentioned in this complaint were plaintiff's employer and residents of San Mateo County, California. From plaintiff's date of hire on November 22, 2014 until November 22, 2017, plaintiff's immediate supervisor was Dr. Joan Spicer ("Spicer"). From November 22, 2017 to the present, plaintiff's immediate supervisor was and is Chief Financial Officer David McGrew ("McGrew"). At all times herein alleged, Spicer and McGrew

1    were acting in the course and scope of their employment with defendants.

2        40.    Defendant Does 1 through 20, inclusive, are sued herein under fictitious names.

3    Their true names and capacities are unknown to plaintiff. When their true names and capacities

4    are ascertained, plaintiff will amend this complaint by inserting their true names and capacities

5    herein. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named

6    defendants are responsible in some manner for the occurrences herein alleged, and that plaintiff's

7    damages as herein alleged were proximately caused by those defendants.

8        41.    On or about October 11, 2016, plaintiff filed this complaint for violations of the

9    False Claims Act in this Court. The complaint alleges Medicare fraud, and now Medicaid fraud

10   against defendants, as alleged more fully above.

11       42.    In or around early 2016 through August 2016, prior to filing this complaint,

12   plaintiff raised his concerns about defendants' improper billing practices in staff meetings and to

13   his supervisors. In an August 10, 2016 meeting, plaintiff "shared concerns regarding the practice

14   of billing professional fee and ancillary services for Inpatient stays that do not meet medically

15   [sic] necessary [sic] (medical necessity)." This was a recurring meeting wherein plaintiff

16   discussed defendants' billing and Utilization Review management with the objective of

17   compliant billing. Thus, as of August 2016, defendants knew plaintiff was flagging defendants'

18   improper billing practices.

19       43.    In retaliation for plaintiff's pre-filing and post-filing disclosures of defendants'

20   practice of improperly billing Medicare and Medicaid, defendants intentionally retaliated against,

21   threatened, improperly disciplined and harassed plaintiff for making this False Claims Act

22   Complaint:

23       a.    On  or about September 8, 2016, Spicer issued a Performance

24   Improvement Plan as a first step in setting into motion disciplinary action against plaintiff. The

25   Performance Improvement plans was a direct result of Levy flagging defendants' improper

26   billing and coding practices as well as the absence of a Medicare and/or Medi-Cal Policy and

27   utilization review policy. Plaintiff brought these matters to Joan Spicer's attention in or around

28   August 2016. Spicer told Levy to stay away from any further involvement with these issues and

1   to continue to submit bills regardless of whether the billing was proper or improper.

2         b.    In or around April/May 2017, plaintiff again brought defendants' improper

3   Medicare billing practices to the attention of his then-supervisor, Spicer. Plaintiff told Spicer and

4   McGrew what the billing team should and should not do with respect to Medicare billing. Instead

5   of correcting the wrong, Spicer instead issued a "Counseling Letter" to plaintiff on or about May

6   26, 2017. Spicer's letter confirms that plaintiff told defendants, through Spicer and McGrew, that

7   admitting a patient without medical necessity would be breaking the federal and state laws.

8   Defendants rejected plaintiff's analysis and continued improperly billing Medicare for patients

9   who did not qualify for admission to the hospital. As set forth in Spicer's May 26, 2017 letter,

10  "you [plaintiff] then stated that you were stopping the practice of false billing that I had been

11  doing for the past ten years for all of these patients admitted for no reason." Spicer ignored

12  plaintiff's requests to stop the improper billing of Medicare and initiated discipline against him

13  instead.

14        c.    On or about September 29, 2017, plaintiff met with Joan Spicer, then his

15  supervisor, and David McGrew, defendants' Chief Financial Officer, where, according to Spicer,

16  plaintiff made "serious claims against the [defendant]." During that meeting, plaintiff expressed

17  his concerns over the improper billing of Medicare for admissions with no medical necessity, as

18  alleged in Count I. On or about November 22, 2017, Spicer wrote to David McGrew, "Felix's

19  habit of raising perceived concerns through anecdotal information has caused significant

20  disruption in the organization and significant work for me and others as we attempt to gather the

21  data to investigate the perceived concerns. My experience has been that Felix's representation

22  about the cause of his perceived concerns are often not supported by the data, once it has been

23  gathered and reviewed." Spicer also reported in that memo to McGrew: "Meanwhile, he has

24  accessed prior cases as far back as 2009, though his reason for doing so is unclear…"

25        d.    On or about October 11, 2016, plaintiff filed this case against defendants.

26        e.    On or about November 22, 2017, Spicer wrote McGrew a memo entitled

27  "Felix Levy Transition of Supervision Memo" wherein she raised baseless concerns over Levy's

28  work performance, another form of discipline and harassment.

1                    f.        On or about early 2018, the name of the plaintiff/relator Felix Levy was

2  disclosed to defendants. Defendants indicated that it was no surprise and indicated that

3  defendants already knew the whistleblower was plaintiff Felix Levy. In retaliation, on or about

4  May 30, 2018, McGrew, in part relying on the memos and performance improvement plan

5  written by Spicer, issued a Letter of Reprimand to plaintiff Felix Levy to further defendants'

6  retaliatory campaign against him. In that letter, McGrew charged Levy with the failure to ensure

7  that a patient received timely and appropriate clinical care in February 2018, when the

8  contemporaneous medical records established that others, namely the attending nurse, had

9  cancelled the patient's surgery, not plaintiff. McGrew wrote in the Letter of Reprimand: "In

10  issuing this letter, I am aware and am familiar with a memo you received from your prior

11  supervisor, Chief Nursing Officer Dr. Joan Spicer, on February 19, 2016, regarding expectations

12  for your position, and a performance expectations memo you received on July 28, 2016. I am

13  also aware that you were placed on a Performance Improvement Plan (PIP) on September 8,

14  2018, which was updated on September 21, 2016, October 5, 2016, and finalized as of December

15  30, 2016, and that you received a counseling letter on May 26, 2017, related to your conduct and

16  performance. On November 22, 2017, during our meeting with SMMC CEO Dr. CJ Kunnappilly

17  and employee and Labor Relations Analyst Liz Caserza, you received a copy of the Transition

18  memo that Dr. Spicer provide to me in connection with transitioning your direct report

19  relationship to me, in which she detailed your incomplete work assignments related to you PIP. I

20  am issuing this Letter of Reprimand in an effort to communicate to you the seriousness of this

21  situation. Should there be similar incidents of this nature where your actions and lack of follow

22  through avoidable delays [sic] or jeopardizes a patient's care/safety placing both the San Mateo

23  Medical Center and the County at risk of liability, disciplinary action may be taken up to and

24  including dismissal from County employment." It is clear that from early 2016 to the present,

25  defendants have issued trumped up allegations of plaintiff's alleged poor performance to set the

26  stage for his termination due to his whistleblower actions pre-filing and after the filing of his

27  complaint.

28

1            g.     On or about February 26, 2018, someone employed by defendants

2  informed the police that Levy was a danger to himself and others and may have a gun. As a

3  result, on February 26, 2018, five police offers from the San Francisco police came to Levy's

4  home to verify that plaintiff worked for defendants. Plaintiff's mother-in-law opened the door

5  and told the officers that plaintiff was at work. Plaintiff was at work at the time the police went

6  to his home. The police asked if plaintiff was "okay" and plaintiff's mother-in-law responded,

7  "Yes, as far as I know." Plaintiff's mother-in-law later told plaintiff that the Redwood City

8  Sheriff's department called the San Francisco Police and said the word "gun" was mentioned at

9  plaintiff's place of work, so the matter was escalated to the San Francisco Police Department.

10  Plaintiff then called the Redwood City Sheriff's Department, who told plaintiff that the word

11  "gun" was mentioned at plaintiff's place of work and a distress call was placed from defendant

12  San Mateo Medical Center stated that plaintiff "was acting odd" and that they "hoped he does

13  not have a gun." That night, plaintiff personally visited the Richmond District Police Department

14  who told plaintiff he was not in any trouble and stated "this was a very strange call from

15  Redwood City and they were unsure as to what the Redwood City Police wanted them to do."

16  Later, plaintiff received a call from DeAdnre James, defendant's Chief Operating Officer, who

17  asked plaintiff is he was alright because he had received an email from someone working for

18  defendant that plaintiff "was acting odd and looked like he [Levy] was under a lot of stress and

19  hoped that he [Levy] did not have a gun." Plaintiff asked James why he did not call plaintiff

20  directly and that it felt like intimidation and retaliation to plaintiff regarding the situation

21  between plaintiff and defendants. As a result of this incident, plaintiff requested a formal HR

22  investigation into these events, but has not been able to discover the name of the person who

23  made the call.

24            h.     On or about May 11, 2018, plaintiff's wife, Maryam Dadashova, who also

25  worked for defendants, was terminated effective June 1, 2018, without explanation.

26            i.     On or about May 30, 2018, plaintiff served McGrew with his Demand for

27  an Immediate Retraction of the May 30, 2018 letter of reprimand, with supporting evidence that

28  defendant's claim that plaintiff had endangered a patient was false. Despite this evidence,

1  McGrew refused to retract the May 30, 2018 letter of reprimand.

2          j.    After a meeting on June 4, 2018, McGrew emailed plaintiff the following:

3  "The fact that you continue to promulgate the notion that Management is directing staff to do

4  something inappropriate and you are not communicating & supporting the existing SMMC

5  policy is deeply concerning and shows an unacceptable lack of judgment and leadership for a

6  CSM-II. All of these actions taken by defendants against plaintiff constitute retaliation.

7      WHEREFORE, qui tam plaintiff prays for relief as follows:

8      1.    For full recitation to the United States of all money damages sustained;

9      2.    For three times the dollar amount proven to have been wrongfully sold to, paid by

10          or withheld from the United States;

11      3.    For maximum civil penalties for all false records, statements, certifications and

12          claims submitted to the United States;

13      4.    For damages due to defendant's retaliation of plaintiff;

14      5.    For costs of suit, reasonable attorney's fees and the maximum relator share; and

15      6.    For such other and further relief as the Court deems just and proper.

16  DATED: July 11, 2018                FOREMAN & BRASSO

17

18                      By:    /s/ Ronald D. Foreman

19                           Ronald D. Foreman
                         Attorney for *qui tam* plaintiff Felix Levy